LONNIE RATLIFF, JR.
2304  9th Avenue, Front Unit and Rear Unit
Oakland, California 94606
Telephone: (510) 436-7361
Facsimile: (510) 532-1194
Email: janetamaz@hotmail.com

Plaintiff in Pro Se

FILED

APR 18 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

#2
P&
SI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CV 17   2155   EMC

| | |
|---|---|
| LONNIE RATLIFF, JR., an individual,<br><br>Plaintiff,<br><br>v.<br><br>JP MORGAN CHASE BANK, N.A., a National Banking Association aka CHASE; EMC MORTGAGE, LLC f/k/a EMC MORTGAGE CORPORATION; HOMESALES, INC. , a Delaware corporation; THE MORTGAGE STORE FINANCIAL, INC., a California corporation; IMPAC MORTGAGE HOLDINGS, INC. a Maryland corporation; DEUTSCHE BANK NATIONAL TRUST COMPANY aka DEUTSCHE BANK TRUST AS TRUSTEE FOR SECURITIZED TRUST IMPAC CMB 2003-12 TRUST; MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., a Delaware corporation; EXECUTIVE TRUSTEE SERVICES, LLC., a limited liability company; FIRST AMERICAN TITLE INSURANCE CO. and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.:<br><br>VERIFIED COMPLAINT FOR:<br><br>1.  WRONGFUL FORECLOSURE<br>2.  FRAUD IN THE CONCEALMENT<br>3.  FRAUD IN THE INDUCEMENT<br>4.  UNCONSCIONABLE CONTRACT<br>5.  BREACH OF CONTRACT<br>6.  BREACH OF FIDUCIARY DUTY<br>7.  QUIET TITLE<br>8.  VIOLATIION OF FAIR DEBT COLLECTIION PRACTICES ACT [15 U.S.C. Sec. 1692f(6)];<br>9.  VIOLATION OF ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT [Calif. Civ. Code Sec. 1788 et seq.];<br>10. VIOLATION OF FAIR CREDIT REPORTING ACT [15 U.S.C. Sec. 1681 et seq.] AND THE CONSUMER CREDIT REPORTING AGENCIES ACT [Calif. Civ. Code Sec. 17851 et seq.];<br>11. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br>12. LIBEL AND SLANDER<br>13. VIOLATION OF UNFAIR PRACTICES ACT [Bus. & Prof. Code Sec. 17200];<br>14. INJUNCTIVE RELIEF<br>15. DECLARATORY RELIEF<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Lonnie Ratliff, Jr., alleges as follows:

## PRELIMINARY STATEMENT

1.     This case is a post-foreclosure wrongful foreclosure action. Plaintiff's position is that the case of Y*vanova v. New Century Mortgage Corporation*, 62 Cal. 4th 919 (2016) is applicable. Additionally, Plaintiff's position is that any defense based upon statute of limitations should be disregarded based upon California's Delayed Discovery Rule and principles of Equitable Tolling. In the *Yvanova* opinion, the California Supreme Court has held that in a wrongful foreclosure case, a borrower has standing to challenge an assignment of a deed of trust even after the property that is the subject of the case has already been sold at a foreclosure trustee's sale. According to the holding of that case, a borrower has standing to sue even if the trustee's sale has already taken place and a trustee's deed upon sale has been issued to a third party and duly recorded. Plaintiff requests that The Court take judicial notice of this landmark opinion. The Supreme Court also held that the "Tender Rule" (requiring a plaintiff to have tendered the full amount of the loan prior to pursuing a wrongful foreclosure or quiet title action) does not block an action such as this case. The California Supreme Court in *Yvanova v. New Century Mortgage Corporation* held further that:

> *"A homeowner who has been foreclosed on by one with no right to do*
> *so has suffered an injurious invasion of his or her rights at the*
> *foreclosing entity's hands. No more is required for standing to sue."*

2.     This case involves a loan secured by a deed of trust on the Plaintiff's residential real property located at the street address of 2304 9th Avenue, Front Unit and Rear Unit, Oakland, California 94606 ("the Property"). Plaintiff alone was the borrower on the Adjustable Rate Note ("the Note") and Deed of Trust ("DOT") related to the Property. Plaintiff is still in possession of both Front and Rear Units and seeks, inter alia, injunctive relief to prevent him and his family

from being evicted and rendered homeless pending the outcome of this case. Plaintiff only recently discovered the violations of these laws. As with most Americans, Plaintiff is not familiar with laws governing mortgage transactions and no reason to suspect any violations. In connection with the violations alleged herein, the Delayed Discovery Rule and the Doctrine of Equitable Estoppel applies to toll any limitations period until the time Plaintiff became aware of the violations, or reasonably should have become aware through the exercise of due diligence. As will be seen later in this complaint, there was a concerted effort by the defendants to deceive Plaintiff and conceal from Plaintiff the true facts underlying this complaint. Defendants actively conspired amongst themselves to make certain affirmative representations to Plaintiff. In fact, Defendants did make those certain affirmative representations to Plaintiff that made it impossible or highly unlikely that Plaintiff would be able to discover the truth until after Plaintiff had made a number of frustrating attempts to discover the truth by filing lawsuits in Alameda County Superior Court. Only within the last two months prior to filing this complaint did an unforeseen occurrence take place that triggered a certified forensic examination of Plaintiff's loan. The results of that examination were shocking and raise questions not only about the legality of the Defendants' actions and omissions, but also about the ethics of the attorneys who represented the corporate business entities. The conduct of one of the attorneys for one of the Defendants even caused him to be sanctioned by the Superior Court for fraud on the Plaintiff and on the Superior Court in an effort to evict Plaintiff. The actions and omissions of the Defendants have taken a toll on the Plaintiff's health over the years of the battle against them. At this time based upon the conspiracy, fraud. fraudulent misrepresentations, and violations of federal and state laws, Plaintiff is awaiting eviction from the Front Unit of the Property and trial by jury concerning his right to possession of the Rear Unit of the Property.

## JURISDICTION AND VENUE

3.     Jurisdiction of this court is invoked under a federal question pursuant to the federal statutes outlined above and 28 U.SC. Sections 1031, 1331, 1332 (a) (1) and 15 U.S.C. Sections 1692f(6) and 1681 et seq.

4.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. sec. 1367.

5.     Venue is proper within this district pursuant to 28 U.S.C. sec. 1391(a) (b) (c), because: (i) the real property exists within said district, and (ii) the defendants, and each of them, have done or are doing business within the district.

## THE PARTIES

6.     Plaintiff is an individual who is, and at all times relevant to this complaint was, a resident of the City of Oakland in the County of Alameda, State of California, and of this judicial district. Plaintiff resides at the Property, his longtime home (transferred to him by Grant Deed from his late father). Plaintiff and his family reside in both Front Unit and Rear Unit at the Property (both units located on the Property, a large lot) located in Oakland, California.

7.     Defendant JP MORGAN CHASE BANK, N.A. (hereinafter referred to as "JP MORGAN" or "CHASE") is, and at all times relevant to this complaint was, a national banking association, which alleges that either it or its Successors and Assigns are the current beneficiary of the deed of trust that secured the Note or the record owner of the Property. At all times relevant to this complaint, JP MORGAN and CHASE were doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

8.     EMC MORTGAGE, LLC f/k/a EMC MORTGAGE CORPORATION (hereinafter referred to as "EMC") is, and at all times relevant to this complaint was, a Delaware limited

liability company doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

9.     Defendant HOMESALES, INC. (hereinafter referred to as "HOMESALES") is, and at all times relevant to this complaint was, a Delaware corporation doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

10.     THE MORTGAGE STORE FINANCIAL, INC. (hereinafter referred to as "THE MORTGAGE STORE, INC.") is, and at all times relevant to this complaint was, a California corporation doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

11.     DEUTSCHE BANK NATIONAL TRUST COMPANY (hereinafter referred to as "DEUTSCHE BANK TRUST") is a national commercial bank acting as a trustee for mortgage-backed securitized trusts (including the one in this case) and all times relevant to this complaint was, a business entity doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

12.     MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. (hereinafter referred to as "MERS") is, and at all times relevant to this complaint was, a Delaware corporation doing business in the City of Oakland, County of Alameda, State of California and in within the jurisdiction of This Court.

13.     EXECUTIVE TRUSTEE SERVICES, LLC. (hereinafter referred to as "ETS") is, and at all times relevant to this complaint was, a limited liability company formerly known as EXECUTIVE TRUSTEE SERVICES, INC., doing business in the City of Oakland, County of Alameda, State of California and within the jurisdiction of This Court.

14.     Defendant FIRST AMERICAN TITLE INSURANCE COMPANY is a business entity of unknown type and subsidiary of FIRST AMERICAN FINANCIAL CORPORATION (hereinafter referred to as "FIRST AMERICAN") is, and at all times relevant to this complaint was, a California business of unknown nature. FIRST AMERICAN is designated as the "Trustee" on the DOT. At all times relevant to this complaint, FIRST AMERICAN was DOING business as agent of Wells Fargo and engaged in the process of drafting, executing, notarizing, and recording foreclosure documents related to the Trustee's Sale of the Plaintiff's home.

15.     Defendant Depositor is an as-of-yet unidentified corporation doing business in the City Oakland, County of Alameda, State of California and within the jurisdiction of This Court. Defendant is the purported "Depositor" for bankruptcy remote Special Purpose Vehicle IMPAC 2003-12 Trust. Plaintiff is further informed and believes, and thereon alleges that Defendant Depositor was acting in the capacity of a qualified intermediary for credit swap conveyances associated to the 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.

16.     Defendant DEUTSCHE BANK TRUST, acting in the capacity of Trustee for the bankruptcy remote Special Purpose Vehicle IMPAC CMB 2003-12 Trust (herein referred to as "IMPAC 2003-12 Trust") is a National Banking Association doing business in the City of Oakland, County of Alameda, State of California. Plaintiff is informed and believes, and thereon alleges that Defendant DEUTSCHE BANK TRUST, acting in the capacity as Junior Secured Party to THE MORTGAGE STORE in the special purpose vehicle  (SPV) transaction scheme is offering securities to the secondary market for the purpose of obtaining certificate holder's acquired funds by Special deposit to execute a 26 U.S.Code Section 1031 – Exchange of property held for productive use or investment warehouse line of credit, more particularly

described in this Complaint. See (**Exhibit H**) Special Purpose Vehicle Patent. This exhibit is incorporated by reference as part of this Complaint.

17.   Plaintiff is informed and believes, and thereon alleges that MERS was acting in the capacity of electronic agent and as a purported Nominee/Beneficiary for THE MORTGAGE STORE under the terms of the DOT and subsequently acting in a capacity of bailor/bailee for each successor defendant of bankruptcy remote Special Vehicle IMPAC 2003-12 Trust associated to the 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.

18.   Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 100, inclusive and therefore sues these defendants by such fictitious names and will ask leave of court, if necessary, to amend this complaint to show the true names and capacities when the same have been ascertained. Plaintiff is informed and believes and on that basis, alleges that Defendants Does 2 through 50, inclusive, are in some manner responsible for the acts, occurrences and transactions as officers, directors or managing agents of Defendants or their agents, servants, employees and/or joint venturers and as set forth in this complaint, and that each of them are legally liable to Plaintiffs, as set forth below and herein:

a) Said Officers, directors or managing agents of Defendants personally acted with oppression, fraud or malice with respect to the matters alleged in this complaint;

b) Said officers, directors or managing agents of Defendants personally authorized, approved of adopted and/or ratified the acts alleged herein or the agents, servants, employees and/or joint venturers of Defendants did so act;

c) Said Officers, directors or managing agents of Defendants personally had close

supervision of their agents, servants, employees and/or joint venturers of Defendants;

d) Said Officers, directors or managing agents of Defendants personally had close supervision of their agents, servants, employees and/or joint venturers of Defendants;

e) Said Officers, directors or managing agents of Defendants personally failed to investigate the circumstances appertaining to the acts alleged herein. They also failed and refused to repudiate the alleged actions and failed to redress the harm done to Plaintiff. Further, said Officers, directors, or managing agents of Defendants failed and refused to punish or discharge the said agents, servants, employees and/or joint venturers of Defendants, even after learning of the acts of the agents, servants, employees and/or joint venturers of Defendants. Plaintiffs will seek leave to amend this complaint to set forth the true names and capacities of said fictitiously named Defendants as enumerated above, together with appropriate charging allegations, when learned.

19.    Plaintiff is informed and believes and thereon alleges that at all relevant times herein each Defendant, whether actually or fictitiously named, was the principal, joint venture, agent, servant or employee of each other Defendant, and in acting as such within the course and scope and authority of such relationship, took some part in the acts and omissions hereinafter set forth, by reason of which each Defendant is liable to Plaintiff for the relief prayed for in this complaint, and in any future amended complaint. Further, Plaintiff alleges that each act alleged herein, whether by a named Defendants or fictitiously named Defendants or otherwise, was expressly authorized or ratified, as these terms are used in California Civil Code Section 3294(b), by each and every other Defendant herein, whether named or fictitiously named.

20.    Plaintiff is informed and thereon alleges that defendants, and each of them, including those designated as Does 1 through 100, inclusive, are responsible in some manner for

the occurrences and happenings herein alleged, and that Plaintiff's damages as herein alleged,

were and are the direct and proximate result of the actions of said Defendants, and each of them.

Said Defendants are sued as the principals, agents, partners, servants, employees, and co-

conspirators of each other, whose alleged actions were performed within the course and scope of

their authority and employment, and with the knowledge, consent, approval, and ratification of

said principals, and each of them.

21.     Whenever in this complaint reference is made to any act of a Defendant or

Defendants, such allegation shall be deemed to mean the acts of the defendant or defendants

named in the particular cause of action and each of them, acting individually, jointly, and

severally. This action is not subject to Civil Code section 1812.10, or to Civil Code section

2984.4 and inconsistent allegations are pleaded throughout in the alternative.

## GENERAL ALLEGATIONS

22.     This is an action brought by Plaintiff for injunctive and equitable relief and other

relief.

23.     The real property that is the subject of this litigation is located at the street address

of 2304   9th Avenue, Front Unit and Rear Unit, Oakland, California 94606. Both front and rear

units are located on one large lot and are residential premises being occupied by Plaintiff and his

family. The real property is hereinafter referred to as "The Real Property" and is legally

described as follows:

PARCEL ONE:

THAT PORTION OF BLOCK 143, CITY OF OAKLAND, AS SHOWN UPON
"HIGLEY'S MAP OF CLINTON" FILED JUNE 10, 1854, BOOK "B" OF
DEEDS, PAGE 537, ALAMEDA COUNTY RECORDS, DESCRIBED AS
FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTHEASTERN LINE OF 9TH AVENUE WITH THE NORTHEASTERN LIEN OF EAST 23rd STREET; AND RUNNING THENCE SOUTHEASTERLY ALONG THE SAID LINE OF EAST 23rd STREET 175; THENCE NORTHEASTERLY AND PARALLEL WITH SAID LINE OF 9TH AVENUE
150 THENCE NORTHWESTERLY AND PARALLEL WITH SAID LINE OF EAST 23rd STREET 25 FEET; THENCE SOUTHWESTERLY AND PARALLEL WITH SAID LINE OF  9th AVENUE 50 FEET; THENCE NORTHWESTERLY AND PARALLEL WITH SAID LINE OF EAST 23RD   STREET 150 FEET TO THE SAID SOUTHEASTERN LINE OF 9th AVENUE; THENCE SOUTHWESTERLY ALONG SAID LAST MENTIONED LINE 100 FEET TO THE POINT OF BEGINNING.

EXCEPTING THERE FROM, THAT PORTION THEREOF DESCRIBED IN THE DEED TO SANTOS INC., RECORDED JULY 19, 1995, BOOK 7724, PAGE 374, ALAMEDA COUNTY RECORDS, ALSO EXCEPTING THERE FROM, THAT PORTION THEREOF DESCRIBED IN THE DEED TO SANTOS INC., RECORDED JULY 19, 1995, BOOK 7724, PAGE 376, ALAMEDA COUNTY RECORDS.

ALSO, EXCEPTING THEREFROM, THAT PORTION THEREOF DESCRIBED IN THE DEED TO LILLIAN RUTH SANDMAN, RECORDED AUGUST 24, 1955, BOOK 7761,
PAGE 304, ALAMEDA COUNTY RECORDS.

PARCEL TWO:

EASEMENT FOR OVERLAPPING IMPROVEMENTS, APPURTENANT TO PARCEL ONE ABOVE, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHEASTERLIY LINE OF EAST 23RD STREET, DISTANT THEREON SOUTHEASTERLY 175 FEET FROM THE SOUTHEASTERLY LINE OF NINTH AVENUE AND TO THE SOUTHEASTERNLINE OF THE LAND DESCRIBED IN THE DEED TO GEORGE B. CAHILL, ET UX, RECORDED AUGUST 10, 1945, BOOK 4735, PAGE 303, ALAMEDA COUNTY RECORDS; THENCE NORTHEASTERLY ALONG SAID LAST NAME LINE 73 FEET, 6 INCHES, TO THE ACTUAL POINT OF BEGINNING; THENCE NORTHWESTERLY AND PARALLEL WITH SAID LINE OF EAST 23RD STREET 36 FEET, THENCE NORTHEASTERLY PARALLEL WITH SAID LINE OF NINTH AVENUE 2 FEET; THENCE SOUTHEASTERLY AND PARALLEL WITH SAID LIEN OF EAST  23RD STREET 36 FEET; THENCE SOUTHWESTERLY AND PARALLEL WITH SAID LIEN OF NINTH AVENUE  2 FEET TO THE POINTBEGINNING.

ASSESSOR'S PARCEL NO.: 022-0318-008-06

24.     Plaintiff homeowner disputes Defendants' colorable claim to legal title and equitable title of the Real Property, which is the subject of this instant action, in so much that Plaintiff specifically pledged the Real Property collateral evidenced by the Grant deed and further clarified under the Deed of Trust as Real Property to the Accommodated Non Depository Payor Bank The Mortgage Store Financial, Inc. (hereinafter, Accommodated Party) as Accommodation Party in the 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment (hereinafter, the "1031 – Exchange"). Plaintiff is informed and believes, and thereon alleges that, the Defendant IMPAC 2003-12 as a Junior Secured Party to the MORTGAGE STORE in the Section 1031 – Exchange is attempting to make an unlawful claim to legal title through a fraudulent assignment of enforcement rights of the currently un-perfected underlying Deed of Trust and unlawful equitable claim to ownership to Plaintiff's Real Property through The MORTGAGE STORE hypothecated collateral purported after acquired "proceeds" of the Real Property which through the Deed of Trust lien encumbering Plaintiff's Real property; which is being unlawfully construed as the Intangible Payment Obligation Transferable Record Chattel Paper (hereafter, the "Payment Intangible"), the underlying intangible collateral to the Tangible Note for Accommodation or Bill of Exchange (hereafter, the "Tangible Note). (**Exhibit A**) is a true copy of the Grant Deed. (**Exhibit B**) is a true copy of the Deed of Trust.  These exhibits are incorporated by reference as part of this Complaint.

25.     From 1998 until the financial crash of 2008-2009, over 60 million purported consumer credit loan transactions were purportedly sold by Non-Depository Payor Banks to Special Purpose Vehicles (hereinafter "SPV") via 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment (hereafter, the "Section 1031 - Exchange"). The Plaintiff's purported home loan was one of 60 million scheduled for exchange.

26.     Plaintiff is informed and believes, and thereon alleges that a Section 1031 –
Exchange is the mechanical transactional scheme whereby a purported Tangible Note is
converted/exchanged for a Payment Intangible asset to provide an alternative investment offering
via Special deposit to certificate or bond holders which were expected to be relatively safe;
which, were offered by Wall Street firms to the secondary market through purported mortgage-
backed securities. *See* (**Exhibit C**) OCC Asset Securitization Manual 1997. Pg. 23. This exhibit
is incorporated by reference as part of this Complaint.

For illustrative purposes the following **diagram,** (below) on this page, is included and is
incorporated by reference as part of this Complaint:



27.    Plaintiff is informed and believes, and thereon alleges that certain tax laws known as the Real Estate Mortgage Investment Conduit (hereinafter, REMIC) Tax Reform Act of 1986 were to be observed, and whereby the Non-Depository Payor Banks and Issuing Entities REMIC would be protected from either entity going into bankruptcy. To achieve the desired "bankruptcy remoteness," purported numerous "True Sales" of the Plaintiff's Tangible Note would have had to have occurred by operation of All applicable law.

28.    Plaintiff is further informed and believes, and thereon alleges that there was no "True Sale" of Plaintiff's Tangible Note, a circumstance whereby the MORTGAGE STORE sold Plaintiff's Tangible Note to the "buyer/seller" IMPAC Mortgage Holdings, Inc. in an **ordinary course of business** by offer, acceptance, delivery and consideration given for full value of the entire instrument. (**Exhibit D**) Real Estate and Tax Reform Act of 1986. This exhibit is incorporated by reference as part of this Complaint.

29.    The Accommodated Non Depository Payor Bank (hereafter Accommodated Party) The MORTGAGE STORE, purports to have negotiated in accordance to all applicable law the Tangible Note obligation in an ordinary course of business to successor defendant IMPAC MORTGAGE HOLDINGS, INC.;  likewise, Plaintiff is informed and believes, and thereon alleges that The MORTGAGE STORE, INC. has unlawfully purported to assign, transfer, or convey account debtor capacity as Accommodated Party to IMPAC MORTGAGE HOLDINGS, INC. successor and successor defendants in consideration for a service release premium received for Accommodated Party services rendered for originating the Section 1031 – Exchange on or before closing date of IMPAC 2003-12 Trust. Plaintiff is informed and believes, and thereon alleges that The MORTGAGE STORE, INC. never negotiated the Tangible Note by operation of law for full value in accordance with all applicable law to IMPAC MORTGAGE HOLDINGS,

INC.

30.     The Accommodated Party The MORTGAGE STORE, purports to have

assigned/transferred a beneficial security interest over Plaintiff's Real Property evidenced by The

MORTGAGE STORE, INC., recorded Deed of Trust lien **in an ordinary course of business** to

successor defendants of the Section 1031 – Exchange. Plaintiff is informed and believes, and

thereon alleges that The MORTGAGE STORE, INC. never negotiated the Tangible Note Bill of

Exchange for full value in accordance to all applicable law. Plaintiff is further informed and

believes, and thereon alleges that at best, The MORTGAGE STORE, INC. Delivered a

converted (statutory conversion) an unsecured Tangible Note as "order paper" to IMPAC

MORTGAGE HOLDINGS, INC. for settlement for Accommodated Party services rendered

associated to originating the exchange transaction, **not in the ordinary course of business** and

therefore, could not negotiate, assign, transfer the underlying security intangible beneficial

security interest enforcement right over the power of sale covenant in The MORTGAGE

STORE, INC. currently un-perfected Deed of Trust lien encumbering Plaintiff's Real Property.

31.     As part of the transaction scheme of 26 U.S. Code Section 1031 – Exchange,

Defendants deployed MERS as an electronic agent under the Constructive Deed of Trust as

nominee/beneficiary for each successor Defendant as bailor/bailee to streamline a purportedly

hypothecated security interest "Secret Liens" over the Payment Intangible after acquired

collateral unlawfully construed as "Proceeds" of Plaintiff's Real Property. Plaintiff is informed

and believes, and thereon alleges that MERS only tracks and updates ownership of the Payment

Intangible registered with the MERS database software system; MERS cannot transfer the

beneficial right to the Tangible Accommodated Note instrument; a legitimate "True Sale" of a

Tangible Note instrument **can only be transferred in an ordinary course of business** by proper negotiation for full value, transfer and delivery by operation of all applicable law. *See* (**Exhibit E**) MERS procedural Manual and (**Exhibit F**) MERS Patent. These exhibits are incorporated by reference as part of this Complaint.

32.    Plaintiff is further informed and believes, and thereon alleges that a payment for **full value of the entire instrument in an ordinary course of business** to THE MORTGAGE STORE, INC. from IMPAC MORTGAGE HOLDINGS, INC.  for the Tangible Note for Accommodation at or before it's maturity date destroys the Tangible Note's negotiability and thus, no documents or records can be produced that demonstrate that prior to the December 18, 2003 closing date for IMPAC 2003-12 Trust,  the Tangible Note was duly indorsed, transferred and delivered to IMPAC 2003-12 Trust in an ordinary course of business by operation of all applicable law, including all intervening transfers including any purported transfers in the personal property Payment Intangible. Nor can any documents or records be produced that demonstrate that prior to the December 18, 2003, the Deed of Trust was duly assigned, transferred and delivered to IMPAC 2003-12 Trust, via the Custodian of Records, DEUTSCHE BANK TRUST, including all Secret Liens purportedly securing the Payment Intangible intervening transfers/assignments.

33.    Plaintiff further alleges that any documents, i.e. MERS Assignment of Deed of Trust, that purport to transfer a hypothecated beneficial security interest over the Payment Intangible underlying collateral of the Tangible Note or Bill of Exchange to IMPAC 2003-12 Trust after the Closing date of December 18, 2003 are **void** as a matter of law; no security interest in the Real Property was perfected in the name of any of the successor defendants to the Section 1031 – Exchange. The alleged holder of the Tangible Note is not the beneficiary of the

Deed of Trust. The alleged beneficiary of Plaintiff's Deed of Trust, MERS, did not and does not

have the requisite title, perfected security interest or standing to proceed in a foreclosure or

conduct a trustee's sale of the plaintiff's real property; and /or is not the real party in interest as

agent or nominee to any action taken or to be taken against the Real Property by successor

Defendants to the Section 1031- Exchange. Plaintiff is also informed and believes and thereon

alleges that at al times herein mentioned, any assignment of the Deed of Trust **without proper**

**transfer in an ordinary course of business** of the Tangible Note that it secures is a legal nullity

by operation of law. Plaintiff is informed and believes, and thereon alleges that the IMPAC

2003-12 Trust had no officers or directors and no continuing duties other than to hold assets and

to issue the series of certificates of SPV investment in mortgage-backed securities described in

the Prospectus.

34.     Plaintiff alleges that Defendants, and each of them, cannot establish possession,

show proper receipt, transfer, negotiations, assignment and ownership of the Tangible Note or

Deed of Trust, resulting in imperfect security interests and claims; therefore, none of the

Defendants have perfected any colorable claim of title or security interest in the Real property.

Defendants, and each of them, cannot establish that the Deed of Trust purportedly securing the

Tangible Note was legally and properly acquired in accordance to all applicable law. Plaintiff

therefore alleges, upon information and belief, that none of the parties to the Section 1031-

Exchange transaction, nor any of the Defendants in this case, hold a perfected and secured claim

in the Real Property; and that all Defendants are equitably estopped and precluded from asserting

an unsecured claim against Plaintiff's estate.

35.     Plaintiff alleges that an actual controversy has arisen and now exists between the

Plaintiff and Defendants, and each of them. Plaintiff desires a judicial determination and

declaration of his rights about the Real property and the Tangible Note and Deed of Trust.

36.     Plaintiff also seeks redress from Defendants' identified herein for damages, for other injunctive relief, and for cancellation of written instruments based upon:

> a.   An invalid and unperfected security interest in Plaintiff's Real Property herein described;
> b.   Void "True Sales;"
> c.   An incomplete and ineffectual perfection of a security interest in Plaintiff's Real property

## STATEMENT OF PERTINENT FACTS

37.     Plaintiff had a Forensic Chain of Title Securitization Analysis completed by qualified expert to verify the claims of this complaint. *See* (**Exhibit G**) is the Affidavit of Michael Carrigan.

38.     Plaintiff is the Superior Recorded owners of the Prime Market Property. (**Exhibit A**) is the Grant Deed.

39.     Plaintiff was issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on October 15, 2003 regarding a purported loan to (Accommodated Party) The Mortgage Store Financial, Inc. for $630,000.00.

40.     Plaintiff herein alleges that the signature on the Tangible Note Bill of Exchange instrument as the Accommodation party constitutes a **statutory capacity as Surety** for the Non-Depository Payor Bank, the original Accommodated secured party of record, acting as Trustee/Account Debtor pursuant to a Special Deposit 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment.

41.     Plaintiff pledged a Constructive Deed of Trust granting legal title to Accommodate The Mortgage Store, Financial, Inc. to file against Plaintiff's Superior Claim to Title filed in the Official Records of the Alameda County Recorder's Office on October 24, 2003 as instrument

no. 2003634688. (**Exhibit B**) Deed of Trust.

42.    The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

43.    On July 22, 2005, a Notice of Default was filed with the Alameda County Recorder's Office as instrument no. 2005313100. (**Exhibit I**) Upon receipt of this notice, Plaintiff contacted Executive Trustee Services, Inc., which entity falsely stated to Plaintiff that MERS owned the Note and Deed of Trust and that it and MERS were duly authorized to make a demand for monies. They affirmatively represented to Plaintiff that there was no trust affiliated with Plaintiff's Note and Deed of Trust. Plaintiff relied upon this representation.

44.    On August 12, 2005, a Rescission of Notice of Default was filed with the Alameda County Recorder's Office as instrument no. 2005344857. (**Exhibit J**)

45.    On February 7, 2006, a Notice of Default was filed with the Alameda County Recorder's Office as instrument no. 200647758. (**Exhibit K**) Upon receipt of this notice, Plaintiff contacted Executive Trustee Services, Inc., which stated to Plaintiff that Plaintiff owed the amount of money to MERS. Executive Trustee Services, Inc. knew this was a false statement and hid the true facts from Plaintiff regarding the involvement of Deutsche Bank National Trust Company with Plaintiff's Note and Deed of Trust. Plaintiff relied upon this representation.

46.    On May 17, 2006 and on August 20, 2007, Notices of Trustee's Sale were filed with the Alameda County Recorder's Office as instrument no. 2006196160. (**Exhibit L**) and instrument no. 2007305113 (**Exhibit M**). These notices were filed and signed by Beatrice Osorio, a Trustee Sale Officer for Executive Trustee Services, LLC f/k/a Executive Trustee Services, Inc. Upon receipt of the notices, Plaintiff contacted ETS and MERS by phone and challenged the legitimacy of ETS' right to even prepare and record such a document. ETS and

MERS informed Plaintiff that MERS owned the Note and Deed of Trust and that no other entity of any kind had any involvement with the Note and Deed of Trust other than ETS and MERS. They represented during both calls that ETS and MERS had every legal right to prepare, record, and serve the Notice of Trustee's Sale of Plaintiff's Real Property.  Plaintiff relied on those representations. At the time that ETS and MERS made those representations, they were aware of all the facts and allegations stated in this Complaint, but they withheld that truth from Plaintiff. ETS and MERS intended that Plaintiff would act and/or refrain from acting based upon their statements to Plaintiff during the phone calls. Plaintiff was ignorant of the true facts and allegations concerning everything that is alleged in this Complaint concerning the acts and omissions of all Defendants since he signed the Note and Deed of Trust on October 15, 2003. Because of the circuitous route taken by Plaintiff's Note and Deed of Trust (of which Plaintiff was completely unaware until after he filed a Chapter 7 Bankruptcy Petition and received a letter from JP Morgan aka Chase in February 2017) Plaintiff could not have discovered all the facts alleged in this Complaint despite the exercise of due diligence.

47.     On August 20, 2007, a Notice of Trustee's Sale was filed with the Alameda County Recorder's Office as instrument no. 2007305113. (**Exhibit M**)

48.     On October 12, 2007, a Trustee's Deed Upon Sale was filed with the Alameda County Recorder's Office as instrument no. 2007358240. This document purported to transfer title from Plaintiff to EMC Mortgage Corporation. According to this document, a Trustee's Sale of Plaintiff's real property was allegedly conducted on October 2, 2007 by Executive Trustee Services, LLC f/k/a Executive Trustee Services, Inc. as Trustee. (**Exhibit N**) Plaintiff alleges that Diana Sandoval (the individual who signed the Trustee's Deed Upon Sale) as a "Limited Signing

Officer" for ETS was a "Robo-Signer" who was aware of all the facts alleged in this Complaint and was aware that ETS and MERS had no legal right to conduct a Trustee's Sale of the Plaintiff's Real Property. At the time of the Trustee's Deed Upon Sale, Plaintiff was unaware of the true facts alleged in this complaint (that ETS and MERS had no right to conduct that auction). Upon receipt of the Trustee's Deed Upon Sale, Plaintiff contacted ETS and inquired as to the legal basis for the sale of his home. ETS reiterated that ETS and MERS were legally authorized to conduct the auction. They withheld the true facts which were that they had no authority to conduct that auction. Using all resources available to him at that time, Plaintiff nevertheless could not have discovered, despite the use of due diligence, the true facts of the circuitous and illegal journey taken by his Note and Deed of Trust between October 15, 2003 and October 2, 2007, the date of the Trustee's Sale of his home. At all times prior to the auction of Plaintiff's home, ETS, MERS, and all Defendants in this case were aware of the facts alleged in this Complaint and withheld those true facts from the Plaintiff. Had they not deliberately withheld those facts from the Plaintiff, he would have been able to take the appropriate legal steps to regain title to his home within any applicable statutes of limitations period.

49.     On October 7, 2013, a Grant Deed was filed with the Alameda County Recorder's Office as instrument no. 2013325592. This document purported to transfer title of Plaintiff's real property from EMC Mortgage Corporation to Homesales, Inc. This Grant Deed was signed by Tiffany Skaife, Vice President of EMC Mortgage LLC f/k/a EMC Mortgage Corporation. According to the Grant Deed, Homesales, Inc. paid nothing for the property and received it as a "Gift." (**Exhibit O**) Tiffany Skaife is a well-known and notorious "Robo-Signer" and has been named as a defendant in foreclosure litigation in several cases nationwide. For example, she was a named defendant in a wrongful foreclosure case in the U.S. District Court for the District of

Massachusetts.

50.     On November 4, 20013, Homesales, Inc. filed Unlawful Detainer case no. RG13701842 against Plaintiff and Janet Ratliff (his spouse) in Alameda County Superior Court. This case was seeking possession of the "Front Unit" on Plaintiff's real property.  (**Exhibit P**)

51.     On February 18, 2014, Plaintiff filed an Answer to Unlawful Detainer Complaint in case no. RG13701842. (**Exhibit Q**)

52.     On March 14, 2017, The Alameda County Superior Court entered judgment for possession of the "Front Unit" on Plaintiff's real property in favor of Homesales, Inc. (**Exhibit R**)

53.     On March 20, 2017, the Clerk's Office of Alameda County Superior Court issued a Writ of Possession for Plaintiff's real property at the address of 2304  9th Avenue, Front Unit, Oakland, California 94606. (**Exhibit S**)

54.     On April 12, 2017, Plaintiff was served with a Notice to Vacate by the Alameda County Sheriff's Department. Plaintiff and his family must vacate the Front Unit at 2304  9th Avenue, Oakland, California 94606. (**Exhibit T**)

55.     On February 4, 2014, Homesales, Inc. filed Unlawful Detainer case no. RG14712628 against Plaintiff and Janet Ratliff (his spouse) in Alameda County Superior Court. This case is seeking possession of the "Rear Unit" at 2304  9th Avenue, Oakland, California 94606. (**Exhibit U**). On September 2, 2014, Plaintiff filed an Answer to Unlawful Detainer Case no. RG14712628 and is awaiting jury trial in that matter. (**Exhibit V**)

56.     On January 30, 2017, Plaintiff filed a Chapter 7 Petition in U.S. Bankruptcy Court for the Northern District of California, Oakland Division. The case number was 17-401264. The

judge was the Honorable William J. Lafferty. This Bankruptcy case was subsequently dismissed on April 6, 2017.

57.     On February 2, 2017, JP MORGAN CHASE aka CHASE dispatched a letter to Plaintiff informing him that they held the loan and he had an opportunity to reaffirm the debt with CHASE. Plaintiff called CHASE at the number provided on their correspondence and had numerous phone conversations with CHASE concerning the Note which they claimed he owed. CHASE informed Plaintiff that the **amount he currently owed to CHASE** on the original October 15, 2003 Adjustable Rate Note from THE MORTGAGE STORE FINANCIAL INC. was now $682,782.45.  The letter to CHASE is an attached exhibit. (**EXHIBIT W**)

58.     Even though HOMESALES, INC. claimed that it held title to the Plaintiff's real property based on its 2013 Grant Deed from EMC MORTGAGE (which claimed title based on the 2007 Trustee's Sale authorized by MERS)  CHASE nevertheless informed Plaintiff that it owned the original October 15, 2003 Adjustable Rate Note. This confusion caused Plaintiff to commission the Forensic Chain of Title Securitization Analysis by a qualified expert. A copy of that analysis is attached. See (**Exhibit G**). At all times relevant to this Complaint, Defendant Homesales, Inc. was aware of all the facts alleged in this Complaint concerning the circuitous route taken by the Note and Deed of Trust executed by Plaintiff on October 15, 2003. Defendant Homesales, Inc. agreed with ETS, EMC, MERS, and JP Morgan aka Chase to withhold the true fact that the Trustee's Sale of the Plaintiff's home was legally unauthorized and *void ab initio*. Because of the complexity of what happened to Plaintiff's Note and Deed of Trust, and even though Plaintiff exercised due diligence, between October 15, 2003 and February 2017, Plaintiff could not have discovered all the material facts about the injury he suffered and the identity of all Defendants within any statute of limitations period. Plaintiff alleges that at all times relevant to

this Complaint, all Defendants knew the facts about the circuitous routes of the Note and Deed of Trust as alleged in this Complaint, Defendants intended that their conduct and omissions should be acted upon by the Plaintiff, Defendants knew that Plaintiff was ignorant of the facts alleged in this Complaint and Defendant relied upon Defendants' conduct and omissions to his injury.

59.     Attached as an exhibit is a true copy of the California Supreme Court in the case of *Yvanova v. New Century Mortgage Corporation* (2016) 62 Cal. 4th 919.See (**Exhibit X**).

60.     Plaintiff incorporates by reference by reference **Exhibits A through Z** as part of this Complaint.

## FIRST CAUSE OF ACTION

## WRONGFUL FORECLOSURE AND LACK OF STANDING TO FORECLOSE

**(As to Defendants JP Morgan/Chase, EMC, The Mortgage Store Financial, Inc., Impac Mortgage Holdings, Inc. Deutsche Bank National Company, MERS, ETS, First American)**

A.          **No Defendant Had Standing to Foreclose**

61.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

62.     An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove, regarding their respective rights and duties, in that Plaintiff contends that Defendants, and each of them, do not have an equitable right to foreclose on the Property because Defendants, and each of them, have failed to perfect any security interest in the Real property collateral, or cannot prove to the court they have a valid interest as a real party in interest to the underlying Deed of Trust. Thus, the purported power of sale, or power to foreclose non-judicially, by the above-specified Defendants, and each of them, no longer applies.

63.     Plaintiff requests this Court find that the purported power of sale contained in the Deed of Trust is a nullity by operation of law, because Defendants' actions in the processing, handling and attempted foreclosure of this Section 1031 – Exchange involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiff to be an equitable disadvantage to Defendants, and each of them. Plaintiff further requests that title to the Real Property should be ordered reverted to the Plaintiff's name and that the sale of the Real Property to EMC and the transfer of title from EMC to Homesales, Inc. should be declared by the Court to be "unlawful and void."

**B.      Defendant MERS Cannot be a Real Party in Interest in a Securitized Mortgage**

64.     Since the creation of Defendant's Deed of Trust, Defendant MERS was named the "nominee beneficiary" of the Deed of Trust.

65.     Plaintiff is informed and believes and thereon alleges that Defendant MERS lacks the authority under its corporate charter to foreclose a Deed of Trust, or to own or transfer an interest in a tangible Note debt obligation because MERS charter limits MERS' powers and duties to functioning as an electronic registration system of Payment In tangible Chattel Paper Transferable Records as the underlying collateral to the Tangible Note for accommodation Bill of Exchange.

66.     Plaintiff is informed and believes and thereon alleges that to conduct a foreclosure action, a person or entity must have legal capacity as interested party and standing.

67.     The Tangible Note in this action identifies the entity to whom it is accommodated, the Originator. Therefore, the Tangible Note herein cannot be transferred **in an ordinary course of business**; the attachments to the Notice of Default do not establish that indorsements were

made, nor are there any other notices which establish that Tangible Note negotiation was executed in an ordinary course of business, nor are there any other notices which establish that the Originator sold the Tangible Note to another party for full value.

68.     Furthermore, insofar as the parties to the Section 1031 – Exchange of Defendant's purported transfer of enforcement contract rights over the Deed of Trust base their claim that the Tangible Note and underlying Security was negotiated by operation of law in an ordinary course of business to Defendant DEUTSCHE BANK TRUST, the Trustee of the Section 1031 – Exchange herein, by the Originator, it is well established State law that the assignment of a Deed of Trust **does not automatically** assign the Tangible Note nor the underlying Payment Intangible Transferrable Record as the security interest is incident of the Tangible Note debt obligation.

69.     Pursuant to State law, one must be able to prove their capacity of holder of the Tangible Note as one with rights acquired in the ordinary course of business to perfect the transfer of enforcement contract rights of the Deed of Trust instrument as collateral for a Tangible Note obligation. Without proper negotiation and physical transfer, the "true sale" of the Tangible Note is invalid as a fraudulent conveyance, or as an unsecured Tangible Note stripped of the Real Property collateral.

70.     Defendant MERS failed to submit documents authorizing MERS, as nominee beneficiary for the Originator, to assign the subject Deed of Trust to the Special Purpose Vehicle trustee. Hence, MERS lacked authority as mere nominee beneficiary to assign Plaintiff's Deed of Trust, making any assignment from MERS defective.

71.     Any attempt to transfer the beneficial interest of a trust deed without actual ownership of the underlying Tangible Note attached together in one with the underlying Payment Intangible Transferable Record, is void under law. Therefore, Defendant MERS cannot establish

that it is entitled to assert a claim in this case. For this reason, as well as the other reasons set forth herein below, MERS cannot transfer an interest in Real Property, and cannot recover anything from Defendants' with unclean hands.

72.     Defendants, and each of them, through the actions alleged above, claim the right to illegally commence foreclosure sale of Plaintiff's Real Property under the Deed of Trust on the Real property via an "In- Rem" action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that Real Property is unique. On or about July 22, 2005.

73.     The wrongful conduct of the above specified Defendants, and each of them, unless restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiff. Plaintiff will not have the beneficial use and enjoyment of his home and will be rendered homeless as the proximate result of a void assignment, an illegal foreclosure, an illegal Trustee's Sale, and an illegal Grant Deed given to a corporation which obtained a judgment for possession of the Real Property through an Unlawful Detainer case in which Plaintiff was barred from raising the defense of a wrongful foreclosure on his home.

74.     Plaintiff has no other plan, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate to prevent irreparable loss to Plaintiff. Plaintiff suffered and will continue to suffer unless Defendants' wrongful conduct is restrained and enjoined because Real Property is inherently unique and it will be impossible for Plaintiff to determine the precise amount of damage it will suffer.

## SECOND CAUSE OF ACTION

## FRAUD IN THE CONCEALMENT

**(As to Defendant The Mortgage Store Financial, Inc.)**

75.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

76.   Generally, one must prove the following to bring a legally sufficient claim of Fraudulent Concealment:

>  a. Concealed or suppressed a material fact;
>  b. Had knowledge of this material fact;
>  c. That this material fact was not within reasonably diligent attention, observation, and judgment
>     of the Plaintiff;
>  d. That Defendant suppressed or concealed this fact with the intention that Plaintiff be misled as
>     to the true condition of the property; and
>  e. That Plaintiff was reasonably so misled; and
>  f. That Plaintiff suffered damage.

77.   Defendant The Mortgage Store Financial, Inc. concealed the fact that they were not a Federal Reserve Depository Bank. The purported lender claims to have accepted by negotiation the issuer Plaintiff's negotiable instrument as debtor in a deposit account; Defendant The Mortgage Store Financial, Inc. furthered their deception by purporting to give consideration for an instrument Defendants' purport to Plaintiff's issued Negotiable Instrument in the form of real money executing an underlying obligation (indebtedness) between the parties to the purported contract. Defendant The Mortgage Store Financial, Inc. concealed in the presentation of the terms of the Mortgage contract a cross acceptance of which Plaintiff, the issuer of the negotiable instrument would accept ownership of the real property collateral evidenced by the Warranty Deed for executing an accommodation negotiable instrument and pledged security agreement on behalf of The Mortgage Store Financial, Inc., the Accommodated Party, for the purpose of a material variation to the purported contract in which Plaintiff would be acting as *Guarantor* for the Mortgage Store Financial, Inc., the Accommodated party, to use Plaintiff's accommodation party's promise to put the accommodated into funds as surety and a personal property security

interest in Plaintiff's pledged security instrument as collateral to secure their account debtor status for the purpose of a Section 1031 – Exchange (table funded) transaction for a service release premium shortly after the closing of the purported loan. Defendant The Mortgage Store, Financial, Inc. concealed a third-party Sponsor Bank warehouse lender as well as the terms of the Securitization Agreements including, inter alia: (1) Financial Incentives paid; (2) existence of Credit Enhancement Agreements, and (3) existence of Acquisition Provisions. By concealing the securitization, the true character of the purported loan in this way had a materially negative effect on Plaintiff that was known by Defendant The Mortgage Store Financial, Inc. but not disclosed.

78.   Defendant The Mortgage Store Financial, Inc. knew or should have known that there was no meeting of the minds between Plaintiff and the Originator. The Mortgage Store Financial, Inc. regarding the true capacity of the parties and material facts of the purported loan and that most importantly, it created no indebtedness underlying obligation between the Defendants and other parties to the Section 1031 – Exchange.

79.   Defendant The Mortgage Store Financial, Inc. knew or should have known that had the truth been disclosed, Plaintiff would not have pledged a security agreement to The Mortgage Store Financial, Inc. the Accommodated Party as an alternate means of collection.

80.   Defendant The Mortgage Store Financial, Inc. intended to induce Plaintiff based on these material misrepresentations and improper disclosures.

81.   Plaintiff's reasonable reliance upon the misrepresentations was detrimental. But for failure to disclose the true and material terms of the transaction, Plaintiff could have been alerted to issues of concern. Plaintiff would have known of Defendant's true intentions and profits from the proposed purported loan. Plaintiff would have known that the actions of the Defendant The

Mortgage Store Financial, Inc. would have an adverse effect on the value of Plaintiff's home by clouding the title.

82.     Defendant's failure to disclose the material terms of the transaction induced Plaintiff to enter the Section 1031-Exchange purported loan and accept the Services as Accommodated party herein.

83.     Defendants were aware of the misrepresentations and profited from them.

84.     As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, and Plaintiff incurred costs and attorney's fees.

85.     Defendant The Mortgage Store Financial, Inc. is guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover in addition to actual damages, punitive damages to punish Defendant and to deter them from engaging in future misconduct.

## THIRD CAUSE OF ACTION

## FRAUD IN THE INDUCEMENT

**(As to Defendants JP Morgan/Chase, EMC, The Mortgage Store Financial, Inc., Deutsche Bank National Trust Company, MERS, ETS, First American)**

86.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87.    Defendants, intentionally misrepresented to Plaintiff that Defendants were entitled to exercise the power of sale provision contained n the Deed of Trust. In fact, Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the Property.

88.    Defendants misrepresented that they were the "holder and owner" of the Tangible Note and the beneficiary of the Deed of Trust. However, this was not true and was a misrepresentation of material fact. Documents state the Originator allegedly sold the mortgage loan instrument to IMPAC 2003-12 Trust. Defendants are attempting to collect on an intangible debt obligation via the Section 1031-Exchange to which they have no legal, equitable, or pecuniary interest relating to Plaintiff's Real property. This type of conduct is outrageous. Defendants fraudulently foreclosed on the Real Property in which they had no monetary or pecuniary interest, and did so with unclean hands.

89.    Defendants' failure to disclose the material terms of the transaction induced Plaintiff To enter the Section 1031 – Exchange and accept the Accommodated Services as alleged herein.

90.    The material misrepresentations were made by Defendants with the intent to cause Plaintiff to reasonably rely on the misrepresentations to induce Plaintiff to submit to the foreclosure on the Real Property as opposed to recovering from predecessors in the Section 1031 – Exchange on the Payment Intangible Obligation.

91.    Defendants were aware of the misrepresentations and profited from them.

92.    As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, and other expenses incurred by Plaintiff (including costs and attorney's fees).

93.    Defendants are guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover in addition to actual damages, punitive damages to punish Defendants and to deter them from engaging in future misconduct.

**FOURTH CAUSE OF ACTION**

**UNCONSCIONABLE CONTRACT**

**(As to Defendant The Mortgage Store Financial, Inc. – IMPAC 2003-12)**

94.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

95.    The actions of Defendants as set forth herein, resulted in Plaintiff being forced, tricked, and misled into parting with their property.

96.    Generally, one must prove the following in order to bring a legally sufficient claim of Unconscionable Contract:

> a. Undue Influence;
> b. Duress;
> c. Unequal Bargaining Power;
> d. Unfair Surprise; and
> e. Limited Warranty.

97.    Defendant The Mortgage Store Financial, Inc. in the origination of the purported loan that specific criteria such as FICO score and other industry standard underwriting requirements must be met to qualify for a loan of money for the subject property from The Mortgage Store Financial, Inc.

98.     Defendant The Mortgage Store Financial, Inc. presented in the origination of the purported loan that a preliminary signature on the Mortgage loan contract was required to "lock in" an interest rate regarding the terms of the purported loan.

99.     Defendant The Mortgage Store Financial, Inc. failed to clarify in the terms of the Mortgage loan contract that the Mortgage Store Financial, Inc., the Originator on the contract, was in fact acting solely in the capacity as Accommodated Party account debtor beneficiary for a purported loan of money. The Mortgage Store Financial, Inc. **concealed** that they were financially benefitting by bargaining with a third party to acquire a service release premium via wire funds transfer to table fund the purported loan at the closing using a warehouse line of credit.

100.    Defendant The Mortgage Store financial, Inc. knew or should have known that through a consciousness of innocence Plaintiff was at a special disadvantage when attempting to grant an alternate means of collection via the Security Instrument real property lien Mortgage to The Mortgage Store Financial, Inc.

101.    Defendant The Mortgage Store Financial, Inc. intended to exploit Plaintiff's special disadvantage and deny Plaintiff's superior rights to the subject property.

## FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT

**(As to Defendants The Mortgage Store Financial, Inc.
and Mortgage Electronic Registration System, Inc. aka MERS)**

102.    Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

103.    The terms of the mortgage contract are clear.

104.   Pursuant to paragraph 23 – Release, Defendant The Mortgage Store Financial, Inc. and specifically Defendant MERS, their electronic agent, was obligated to satisfy, release and reconvey the beneficial security interest in Plaintiff's pledged Deed of Trust upon payment of all sums associated with the release premium to The Mortgage Store Financial, Inc. for Accommodated Party services rendered.

105.   Defendant the Mortgage Store Financial, Inc. was paid in full for their Accommodated capacity to the Tangible Note and Deed of Trust when it sold and relinquished its interest in Plaintiff's real property to Depositor.

106.   Defendant The Mortgage Store Financial, Inc. failed to satisfy, release and reconvey the security interest, thus breaching the terms found in paragraph 23 of the Deed of Trust.

## SIXTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

**(As to Defendant The Mortgage Store Financial, Inc. and
Mortgage Electronic Registration System, Inc. aka MERS)**

106.   Plaintiff re-alleges and incorporates herein by reference all previous paragraphs as though set forth herein.

107.   Generally, one must prove the following to bring a legally sufficient claim of Breach of Fiduciary Duty.

a. Breach of full disclosure;

b. Breach of good faith and fair dealing;

c. Misuse of superior or influential position;

d. Misuse of superior knowledge; and

e. Failure to act in another's best interest

108.    Defendants The Mortgage Store Financial, Inc. and MERS failed to disclose to Plaintiff that they were not the legitimate creditor but more accurately, were account debtor in the accommodated table funded 26 U.S. Code Section 1031 – Exchange of property held for productive use or investment to IMPAC 2003-12.

109.    Defendants The Mortgage Store Financial, Inc. and MERS, as beneficiaries under the Mortgage having only an Accommodated personal property interest over the Real Property collateral failed to meet their fiduciary duty to satisfy, release and reconvey the Real Property Lien Deed of Trust and the beneficial security interest (personal property) therein after receiving payment for all sums represented as the servicer release premium.

110.    After October 15, 2003, and unknown to Plaintiff, Defendants The Mortgage Store Financial, Inc. and MERS for payment rendered through a service release premium divested themselves of their capacity under Accommodated Note but did not comply with the covenants of the Deed of Trust specifically, Covenant 23 – Release.

## SEVENTH CAUSE OF ACTION

## QUIET TITLE

**(As to Defendants J Morgan Chase Bank, N.A. aka Chase and Homesales, Inc.)**

111.    Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

112.    All Defendants named herein claimed an interest and estate in the Subject Property adverse to Plaintiff in that Defendants assert they are the owner of the note secured by the Deed of trust to the property that is the subject of this suit.

113.    All Defendants named herein claim an interest and estate in the Real Property adverse to Plaintiff in that Defendants assert that they are the owners of the Tangible Note secured by the Deed of Trust to the Real Property, the subject of this suit.

114.    The claims of all Defendants are without any legal right whatsoever, and Defendants have no estate, title, lien or interest in or to the Real Property, or any part of the Real Property construed and hypothecated as "After Acquired Collateral" the Intangible Payment transferable record to the Section 1031 – Exchange.

115.    The claim of all Defendants herein named, and each of them, claim some estate, right, title, lien or interest in or to the property adverse to Plaintiff's title, and these claims constitute a cloud on title to the Real Property.

116.    Plaintiff therefore alleges upon information and belief, that none of the parties to the Section 1031 – Exchange transaction, nor any of the Defendants in this case hold a perfected and secured claim in the Real property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's Real Property Estate.

117.    Plaintiff requests the decree permanently enjoining Defendants, and each of them, and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property that is the subject of this case; and

118.    Plaintiff requests the court award Plaintiff's costs of this action, and such other relief as the court may deem proper.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT

### [15 U.S.C. Section 1692f(6)]

**(As to Defendants JP Morgan Chase Bank, N.A., Impac Mortgage Holdings, Inc., Executive Trustee Services, LLC, EMC Mortgage, LLC, and First American Title Insurance Co.)**

119.   Plaintiff re-alleges, and incorporates by reference all previous paragraphs as though fully set forth herein.

120.   Defendants are "debt collectors" as either directly or through agents, as that term is defined in 15 U.S.C. Section 1692 et seq., as they regularly collect debts owed to another person or entity. According to 15 U.S.C. Section 1692f (6), a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Specifically, this section states that *"the taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest"* is a violation of the Fair Debt Collections Practices Act.

121.   Federal law prohibits the use of *"any false, deceptive, or misleading representation or means in connection with the collection of a debt...including the false representation of ...the character, amount, or legal status of any debt...and the threat to take any action that cannot legally be taken..."*

122.   In illegally attempting to collect on Plaintiff's debt obligation in the manner described herein, the Defendants violated the Act in one or more of the following ways:

a. Falsely represented the status of the debt, in particular, that it was due and owing to MERS or some other entity at the time Defendants recorded each of the Notices of Default and Notices of trustee's Sale;

b. Made prohibited threats against Plaintiff, including the threats to conduct a public auction of Plaintiff's home and render him and his family homeless;

c. Falsely represented that Plaintiff was delinquent on his home loan when, in fact, he had actually overpaid and Defendants had failed to account for payments made and assessed his loan account outrageous and illegal charges;

d. Communicated with others concerning Plaintiff's debt;

e. Attempted to collect on the promissory note under false pretenses, namely that the trustee was assigned to Plaintiff's debt when, in fact, they were not;

f. Endorsed and enabled the Foreclosing trustee to engage in foreclosure activities that cannot be legally taken by them;

123.    ETS and MERS are debt collectors because they claimed that Plaintiff's loan was delinquent by recording the Notices of Default and therefore cannot claim exemption from the Act on the basis that it is a lender. Attached as an exhibit is a true and correct copy of a September 9, 2008 Federal Trade Commission Press Release announcing that Defendant EMC agreed to pay $28 million to settle Federal Trade Commission charges that it engaged in unlawful practices in servicing consumers' home mortgage loans. The unlawful practices included misrepresenting the amounts borrowers owed, charging unauthorized fees, and engaging in unlawful and abusive collection practices. The FTC complaint charged EMC with violating the FTC Act, the Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA0, and the Truth in Lending (TILA) Regulation Z. See (**Exhibit Y**).

124.    **Exhibits A through Z** are incorporated by reference as part of this Complaint.

125.    As a result of these violations, in addition to those alleged in paragraphs 1 through 123, Plaintiff is entitled to actual and statutory damages, and attorney's fees and costs.

## NINTH CAUSE OF ACTION

## VIOLATION OF ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT

### [Calif. Civil Code Section 1788, *et seq.*]

**(As to Defendants JP Morgan Chase Bank, N.A., Impac Mortgage Holdings, Inc., Executive Trustee Services, LLC, EMC Mortgage, LLC, and First American Title Insurance Co.)**

126.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set for the herein.

127.    Defendants are "debt collectors" within the meaning of California Civil Code Section 1788.2(c).

128.    Plaintiff is a "debtor" within the meaning of California Civil Code Section 1788.2(h), and in doing the acts alleged, defendants was attempting to collect consumer debts.

129.    Defendants were engaged in the attempted collection of consumer debts and are legally bound to follow the prescriptions of the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), California Civil Code Section 1788, *et seq.*

130.    Defendants violated the RFDCPA, California Civil Code Section 1788.17, through their violations of 15 USC Section 1692 (e) and (f) of the FDCPA, by making false or misleading representations in their unfair attempts to collect debts from the Plaintiff.

131.    Defendants' violations of the RFDCA were intentional and/or malicious.

132.    As a result of the Defendants' violations of the RFDCPA, Plaintiff was harmed and is entitled to damages under California Civil Code Section 1788.30.

### TENTH CAUSE OF ACTION

### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### [15 U.S.C. Section 1681 et seq.]
### AND THE CONSUMER CREDIT REPORTING AGENCIES ACT
### [Calif. Civil Code Section 1785.1 et seq.]

**(As to Defendants JP Morgan Chase Bank, N.A., Impac Mortgage Holdings, Inc., Executive Trustee Services, LLC, EMC Mortgage, LLC and First American Title Insurance Co.)**

133.    Plaintiff re-alleges, and incorporates by reference all previous paragraphs as though fully set forth herein.

134.    Plaintiffs are consumers as this term is defined by 15 USC Section 1681a(c) of the Fair Credit Reporting Act and by Civil Code Section 1785.3 (b) of the Consumer Credit Reporting Agencies Act. All Defendants are "persons" as defined by Civil Code Section 1785.3

(j). All Defendants are also "furnishers" as defined by 15 U.S.C. Section 1681s-2 of the Fair Credit Reporting Act.

135.    In the entire course of their actions, Defendants, and each of them, willfully violated the provisions of the Fair Credit Reporting Act and the Consumer Credit Reporting Agencies Act in at least the following respects:

a. By willfully and negligently furnishing to credit reporting agencies information about the Plaintiff, which Defendants knew, or should have known, was incomplete and inaccurate;

b. By willfully and negligently failing to conduct an investigation of Plaintiff's complete loan file after he provided Defendants with records and information that proved to Defendants they were grossly overbilling him;

c. By willfully and negligently failing to correct and/or delete the incomplete and inaccurate information in Plaintiff's loan payment records after conducting an investigation;

136.    As a proximate result of the actions of the Defendants, and each of them, Plaintiffs have been damaged in an amount which will be proven at time of trial. As provided under the cited laws, Plaintiff is entitled to actual damages, loss of wages, damage to credit reputation, pain and suffering, costs and attorney fees.

137.    Plaintiff alleges that defendants acted with fraud, oppression and malice towards the Plaintiff, deliberately stonewalling in hopes that by the time Plaintiff was able to afford to retain an attorney to seek injunctive and other relief, Plaintiff's home would have been sold at public auction and he would have been evicted before he could take meaningful action.

## ELEVENTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**(As to All Defendants)**

138.     Plaintiff re-alleges, and incorporates by reference all previous paragraphs as though fully set forth herein.

139.     Plaintiff notified the Defendants that the Notices of Default, Notices of Trustee's Sales, and continuing "late payment" notices that they were reporting to the credit reporting agencies were false and inaccurate and he provided proof thereof in the form of records of money transfers. He repeatedly requested of Defendants on numerous occasions that they should cease reporting false and inaccurate negative information about his payment record and delinquency status to the major credit reporting agencies. Defendant Homesales, Inc. in particular has damaged Plaintiff by prosecuting two unjustified Unlawful Detainer cases against Plaintiff which cases are now part of a public record that are having and will continue to have an adverse impact on Plaintiff's creditworthiness. EMC Mortgage, LLC in particular has damaged Plaintiff by prosecuting an unjustified Unlawful Detainer case against a fictitious defendant named "Steve Jones" in Alameda County Superior Court. EMC obtained a default and default judgment against "Steve Jones" after filing false documents with the Superior Court. Plaintiff successfully obtained a court order vacating the phony default and default judgment against "Steve Jones" and exposed the scheme to evict Plaintiff without his having been named in the case or served with summons and complaint in the case. The Superior Court issued an Order to Show Cause re Sanctions against EMC and its attorney (Robert J. Jackson, Esq.) and after a hearing sanctioned them in the amount of $1,500.00. That law firm (Jackson and Associates) and the law Offices of Randall Naiman are on the list of California's top ten law firms that specializing in evicting California borrowers after questionable foreclosures. Attached is a true copy of the Alameda County Superior Court order for Sanctions against EMC and its counsel for committing a fraud on Plaintiff and the Superior Court. See (**Exhibit Z**). This exhibit, along with

the other hereinabove referenced exhibits, are incorporated by reference as part of this Complaint.

140.    The Defendants, and each of them, persisted in reporting derogatory comments to credit reporting agencies, despite knowing that Plaintiff did not owe the money they claimed he did and that, in fact, they were overstating his loan balance on both Notices of Default and the Notice of Trustee's Sale. As a proximate result of the Defendants' acts, Plaintiff has incurred damages including lost credit opportunities and damage to credit reputation, and will incur additional lost opportunities and money in the future in an amount which is continuing and which will be proved at trial. This amount is presently believed to be substantially in excess of the minimum jurisdictional limits of this court. Plaintiff has also sustained general damages according to proof.

141.    The acts of the Defendants and each of them, as set forth herein, were undertaken with the intent to injure Plaintiff or with willful and conscious disregard for the rights of the Plaintiff and constitute clear and convincing evidence of the Defendants' despicable, outrageous, oppressive, malicious, and fraudulent conduct pursuant to California Civil Code Section 3294, entitling Plaintiff to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

## TWELFTH CAUSE OF ACTION
## LIBEL AND SLANDER
### (As to All Defendants)

142.    Plaintiff re-alleges, and incorporates by reference all previous paragraphs as though fully set forth herein.

143.    The reports by Defendants to credit bureaus, which were then picked up as derogatory marks on Plaintiff's credit reports and published by the credit bureaus, constitute

false and unprivileged statements denigrating Plaintiff's creditworthiness and standing in the financial community. These reports were and are both libelous on their face and also understood as libelous in their context. Defendants continued and still continue to publish these reports despite being notified on several occasions of their falsity.

144.    As a result of these false reports, Plaintiff's reputation has been injured and he has suffered a reduction in esteem, respect, goodwill and confidence in the community, not to mention damage to his credit rating. As such, the false information Defendants reported to the credit reporting agencies are both slanderous and libelous per se.

145.    Defendants disseminated Notices of Default and Notices of Trustee's sales of Plaintiff's home to newspapers circulated in the city where Plaintiff lives and these notices were read by a great number of persons in the area of circulation.

146.    At all times mentioned herein Plaintiff had resided in Oakland, California and has enjoyed a good reputation generally throughout his community.

147.    The foreclosure notices that Defendants published in Plaintiff's local newspapers were libelous on their face as they pertain to Plaintiff in that they state and suggest that Plaintiff had defaulted on his home loan.  It is also libelous in that it implies that Plaintiff was suffering severe financial difficulties and/or had disregarded his financial obligations. As such, the foreclosure notices published in local newspapers and recorded at the Alameda County Recorder's Office exposed Plaintiff to hatred, contempt, ridicule and obloquy.

148.    After publication of the notices, Plaintiff contacted the Defendants to rectify the false and defamatory notices, all to no avail.

149.    The above-described notices were published with knowledge of their falsity or with reckless disregard for whether they were true, and thus, Plaintiff seeks an award of punitive damages in an amount to be proven.

150.    As a direct and proximate result of the defamatory notices and statements, Plaintiff has suffered general and special damages above the minimum jurisdictional limits of this court. The actions of Defendants were taken with the intent of making him pay debts he did not owe to preserve his credit standing. As such, the acts of Defendants constitute clear and convincing evidence of Defendants' despicable, outrageous, oppressive, malicious, and/or fraudulent conduct, pursuant to California Civil Code Sections 45, 46, and 3294, entitling Plaintiff to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR PRACTICES ACT
### [California Business & Professions Code, Section 17200]
### (As to All Defendants)

151.    Plaintiff re-alleges, and incorporates by reference all previous paragraphs as though fully set forth herein.

152.    Business & Professions Code section 17000 is known as the "Unfair Practices Act." Business & Professions Code section 17200 prohibits businesses from engaging in *"Unfair Competition,"* which means and includes, inter alia, any unlawful, unfair, or fraudulent business act or practice. Business & Professions Code section 17203 states that any person or business engaging in *"Unfair Competition"* may be enjoined in any court of competent jurisdiction.

153.    Plaintiff alleges that none of the Defendants had authority to have any of its employees, agents, or officers execute, serve, and record any Notice of Default or Notice of

Trustee's Sale. Based on the facts as alleged hereinabove, the Notices of Default could not be used as a legal predicate for any subsequent Notice of Trustee's Sale. These notices were a **legal nullity.** The Notices of Default and/or Notices of Trustee's Sale were prepared, executed, served, and recorded in violation of both civil and criminal laws of various states (including California). The extent of Defendants' civil and criminal liability will be exposed as this case and its discovery progresses.

154.    California Civil Code sections 2924 and 2924c (b) (1) require that the Notice of Default contain an accurate statement that a breach of the secured obligation has occurred and specification of the nature of the default. Plaintiff alleges that amounts consisting of "foreclosure fees," "broker's price opinion fees," and "property inspection fees" and other fees and charges which Defendants have and are demanding from Plaintiff are erroneous and fraudulent, a fact which Defendants and each of them knew and should have reasonably known.

155.    Plaintiff is further informed and believes, and thereon alleges that Defendants have committed acts of unfair competition as defined by Business and Professions Code Section 17200 in failing to comply with consumer statutory protections under Civil Code sections 2924 et seq., among other laws.

156.    On further information and belief, beginning in on or about October 15, 2003 and continuing to the present, Defendants committed acts and omissions (as alleged hereinabove) which constitute unlawful policies and practices in violation of Business and Professions Code Section 17200. These activities include the following:

    a. Executing and Recording false and misleading documents;

    b. Lack of standing to foreclose;

c. Failing to give proper notice of a Trustee's Sale and postponement of the sale pursuant to California Civil code section 2924g and 2924h;

d. Acting as beneficiaries and trustees on the Plaintiff's Note and Deed of Trust without the legal or contractual authority to do so;

e. Substituting the Trustee on a Deed of Trust without the legal or contractual authority to do so;

f. Recording or causing to be recorded false and fraudulent documents which affect real property;

g. Engaging in fraud, malfeasance, and perjury by utilizing Assignment of Deed of Trust and other documents with forged signatures;

h. Recording false and fraudulent documents that affect real property in violation of the California Penal Code (a felony).

157.     Plaintiff is informed, believes, and thereon alleges that Defendants' conduct threatens further violations of consumer law and significantly harms competition. Defendants' failure to comply with statutory provisions that protect property owners from wrongful foreclosure, fraud, fraudulent interference with their contractual and basic property rights threatens further violations of consumer law.

158.     On information and belief, such practices are likely to mislead the general public and wrongfully deprive the public and the Plaintiff of his property. Defendants' practices therefore constitute a fraudulent and unlawful business or practice under the Business and Professions Code section 17200. Other consumers, such as Plaintiff, may lose real property as a consequence of Defendants' unlawful business practices, and thus have no adequate remedy at law.

159.  As a direct and proximate result of the wrongful foreclosure, Plaintiff has suffered equitable harm for which legal damages are insufficient, and declaratory and injunctive relief are therefore warranted, suffered injury in fact and has lost money.

## FOURTEENTH CAUSE OF ACTION

### INJUNCTIVE RELIEF

### (As to Defendant Homesales, Inc.)

160.  Plaintiff re-alleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

161.  The filing of the Notices of Default and the Notice of Trustee's Sale, the conducting of the Trustee's Sale, the issuance and recording of the Trustee's Deed Upon Sale to EMC, the issuance of the Grant Deed to Plaintiff's real property from EMC to Homesales, Inc., and the prosecution and securing of a judgment of possession and writ of execution as to the Front Unit of the Subject Property by Homesales, Inc. were illegal and wrongfully obtained. Plaintiff is waiting for jury trial as to the Rear Unit on the Subject Property. Plaintiff has been served with a Notice to Vacate from the Front Unit no later than April 25, 2017.

162.  If Plaintiff is evicted from the Front Unit of the Subject Property, he will suffer irreparable injury regardless of the future outcome of this case. Only an order from this Court directing Homesales, Inc. to instruct the Alameda County Sheriff's Department not to execute on the Writ of Possession will prevent Plaintiff from being rendered homeless. Unless enjoined by the Court, Plaintiff will be placed out of possession of his home.will soon result in the irreparable loss of Plaintiff's home (which was most recently scheduled for Trustee's Sale on February 26, 2013). Plaintiff has no other plan, speedy, or adequate remedy, and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiff's interests.

163.    Defendants' numerous violations of federal and state statutes and inability to establish a claim of right to Plaintiff's Note or Deed of Trust establishes Plaintiff's claim as more probable than not and Plaintiff will likely prevail at time of trial.

164.    Plaintiff requests that Defendant Homesales, Inc. and its agents and employees be enjoined from prosecuting any further Unlawful Detainer as to the Rear Unit of the Subject Property and be ordered to direct the Alameda County Sheriff's Department from executing any Writ of Possession as to the Front Unit of the Subject Property.

## FIFTEENTH CAUSE OF ACTION
## DECLARATORY RELIEF
### (As to All Defendants)

165.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

166.    An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove regarding Plaintiff's respective rights and duties in the subject note and security instrument. Plaintiff requests a judicial determination of the rights, obligations and interests of the parties regarding the Subject Property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the Subject Property.

167.    Plaintiff should be the equitable owner of the Subject Property.

168.    Plaintiff seeks to quiet title as of the date of the filing of this Complaint. Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that the Defendants be declared to have no interest, estate, right, or title in the subject property and that the Defendants, their agents and assigns, be forever enjoined from asserting any estate, right, title or interest in the Subject Property subject to Plaintiff's rights.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED as Prayer for Relief, and for the foregoing reasons, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final hearing, Plaintiff be awarded judgment:

1.    Declaring that Defendants lack any interest in the subject property which would permit them to foreclose, evict, or attempt to foreclose or evict, the trust deed and/or to sell the subject properties;

2.    Declaring that the trust deed is not a lien against the subject properties, ordering the immediate release of the trust deed of record, and quieting title to the subject properties in Plaintiff and against Defendants and all claiming by, through or under them;

3.    A refund of any wrongfully or improperly collected fees and payments to Defendants to which it had no right;

4.    For compensatory, special, and general damages in an amount according to proof at trial;

5.    For an order compelling defendants to remove any instrument which could be construed as constituting a cloud upon Plaintiff's title to the Subject Property, including the purported Notices of Default, Notices of Trustee's Sale, Substitution of Trustee, Trustee's Deed Upon Sale, Grant Deed, and Assignment of Deed of Trust;

6.    The Court issue an order restraining Defendants, their agents or employees from continuing or initiating any eviction action against the property and enjoining Defendants, their agents or employees from having the Sheriff's Department evict Plaintiff from the Subject Property during the pendency in this matter;

7. For Pre-judgment and Post-judgment interest at the maximum rate allowed by law;

8. For costs of this suit incurred;

9. For reasonable attorney's fees incurred;

10. Monetary relief over $100,000.00 but not more than $5,000,000.00;

11. Trial by jury;

12. A court order enjoining and restraining defendants from engaging in any further illegal, unfair, fraudulent, and discriminatory acts in the course of conducting business in this state and imposing upon defendants any fines, penalties, and sanctions as the Court may deem appropriate;

13. Such other and further relief as this Court shall deem fair, equitable, and just.


Dated: April 18, 2017




LONNIE RATLIFF, JR.
Plaintiff in Pro Se

1
2
3
4
5
6

## **VERIFICATION**

I, Lonnie Ratliff, Jr., Pro Se, am the Plaintiff in the above-entitled matter and have

personal knowledge to testify to the matters stated therein. I have read the facts and allegations

and declare under penalty of perjury in and for the State of California that the above is true and

correct to the best of my knowledge.

I declare under penalty of perjury under the aws of the State of California that the

foregoing is true and correct.

Executed at Oakland, California on this 18th day of April, 2017

LONNIE RATLIFF, JR.
Plaintiff in Pro Se

# EXHIBITS

Exhibit A: Grant Deed

Exhibit B: Deed of Trust

Exhibit C: OCC Asset Securitization Manual , see Pg. 23

Exhibit D: Real Estate and Tax Reform Act of 1986

Exhibit E: MERS Procedural Manual

Exhibit F: MERS Patent

Exhibit G: Certified Forensic Audit by Michael Carrigan

Exhibit H: Special Purpose Vehicle Patent
              http://www.freepatentsonline.com/2003/0105713.html

Exhibit I: Notice of Default, July 22, 2005

Exhibit J: Rescission of Notice of Default, August 21, 2005

Exhibit K: Notice of Default, February 7, 2006

Exhibit L: Notice of Trustee's Sale, May 17, 2006

Exhibit M: Notice of Trustee's Sale, August 20, 2007

Exhibit N: Trustee's Deed Upon Sale, October 12, 2007

Exhibit O: Grant Deed, October 7, 2013

Exhibit P: Unlawful Detainer Complaint case no. RG13701842

Exhibit Q: Answer to Unlawful Detainer case no. RG13701842

Exhibit R: Judgment case no. RG13701842

Exhibit S: Writ of Possession case no. RG13701842

Exhibit T: Notice to Vacate case no. RG13701842

Exhibit U: Unlawful Detainer Complaint case no. RG14712628

**EXHIBITS** - (Cont.)

Exhibit V: Answer to Unlawful Detainer case no. RG14712628

Exhibit W: CHASE letter to Lonnie Ratliff, Jr., February 2, 2017

Exhibit X: California Supreme Court opinion
          Yvanova  v. New Century Mortgage Corporation (2016) 62 Cal. 4th 919

Exhibit Y: EMC $28 million FTC Settlement

Exhibit Z: $1,500.00 Sanctions order against EMC Mortgage Corp. and
          Attorney Robert J. Jackson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
**EXHIBIT A**   - Grant Deed
25
26
27
28

RECORDING REQUESTED BY:

**When Recorded Mail Document
and Tax Statement To:**

Lonnie Ratliff, Sr.
2304 9th Ave.
Oakland, CA 94606

Recorded in Official Records, Alameda County
Patrick O'Connell, Clerk-Recorder
‖‖‖‖‖‖‖‖‖ 10.00

**99026161 09:12am 01/22/99**

004 29065218 29 08
A03 2 7.00 3.00 0.00 0.00 0.00 0.00 0.00 0.00
0.00

Escrow No.
Title Order No.
APN: 22-318-8-6

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

The undersigned grantor(s) declare(s)
Documentary transfer tax is $ _____0_____   City tax $ _____0_____   None—no consideration.  Not purusant
[   ] computed on full value of property conveyed, or                                          to a sale.  No change in equitable
[   ] computed on full value less value of liens or encumbrances remaining at time of sale, title, Grantor is
[   ] Unincorporated Area   City of _Oakland Calif_                                            beneficiary of trust.

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,**

LONNIE RATLIFF, SR., a widower,

hereby **GRANT(S)** to LONNIE RATLIFF, SR., as Trustee of the LONNIE RATLIFF, SR.
1999 TRUST, a revocable living trust dated

the following described real property in the City of of Oakland
**County of**      Alabama                                              **State of California:**

FOR LEGAL DESCRIPTION SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART
HEREOF.

DATED: Jan. 21, 199

STATE OF CALIFORNIA
COUNTY OF _Alameda_
ON _Jan. 21, 1999_ ~~before me,~~
~~personally appeared~~
Lonnie Ratliff, Sr.

~~personally known~~ to me (or proved to me on the
basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the
instrument.

Witness my hand and official seal.

Signature _Glenda A. Najem_

_Lonnie Ratliff Sr_
LONNIE RATLIFF, SR.

GLENDA A. NAJEM
Commission # 1199368
Notary Public - California
Alameda County
My Comm. Expires Oct 23, 2002

MAIL TAX STATEMENT AS DIRECTED ABOVE

FD-13 (Rev 4/94)                                        GRANT DEED

RECORDING REQUESTED BY:

When Recorded Mail Document
and Tax Statement To:

   Lonnie Ratliff, Sr.
   1304 9th Ave.
   Oakland, CA 94606

Escrow No.
Title Order No.

APN:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

The undersigned grantor(s) declare(s)
Documentary transfer tax is $ _____0_____    City tax $ _____0_____    None—no consideration. Not purusant
   [  ] computed on full value of property conveyed, or           to a sale. No change in equitable
   [  ] computed on full value less value of liens or encumbrances remaining at time of sale, title, Grantor is
   [  ] Unincorporated Area    City of _Oakland Calif_____      beneficiary of trust.

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,**

LONNIE RATLIFF, SR., a widower,

hereby GRANT(S) to  LONNIE RATLIFF, SR., as Trustee of the LONNIE RATLIFF, SR.
1999 TRUST, a revocable living trust dated

the following described real property in the City of  of Oakland
County of      Alameda                      State of California:

FOR LEGAL DESCRIPTION SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART
HEREOF.

DATED: _Jan. 21, 199___

                   _Lonnie Ratliff Sr_
                   LONNIE RATLIFF, SR.

STATE OF CALIFORNIA
COUNTY OF _Alameda___
ON _Jan. 21, 1999_____ ~~before me,~~
                ~~personally appeared~~
_Lonnie Ratliff, Sr._____

~~personally known~~ to me (or proved to me on the
basis of satisfactory evidence) to be the person(s)
whose name(s) (is)/are subscribed to the within
instrument and acknowledged to me that he/~~she/they~~
executed the same in (his)/~~her/their~~ authorized
capacity(~~ies~~), and that by his/~~her/their~~ signature(s) on
the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the
instrument.

Witness my hand and official seal.

Signature _Glenda A. Najem_____

GLENDA A. NAJEM
Commission # 1199368
Notary Public - California
Alameda County
My Comm. Expires Oct 23, 2002

MAIL TAX STATEMENT AS DIRECTED ABOVE

FD-13 (Rev 4/94)                      GRANT DEED

BEING A PORTION OF BLOCK 143 OF CLINTON, ACCORDING TO HIGLEY'S
MAP THEREOF ON FILE ALAMEDA COUNTY RECORDS.

PARCEL ONE:

Beginning at the point of intersection of the Southeastern line
of 9th Avenue with the Northeastern line of East 23rd Street; and
running thence Southeasterly along the said line of East 23rd
Street 174 feet; thence Northeasterly and parallel with said line
of 9th Avenue 150 feet thence Northwesterly and parallel with
said line of East 23rd Street 25 feet; thence Southwesterly and
parallel with said line of 9th Avenue 50 feet; thence
Northwesterly and parallel with said line of East 23rd Street 150
feet to the said Southeastern line of 9th Avenue; thence
Southwesterly along said last mentioned line 100 feet to the
point of beginning.

EXCEPTING THEREFROM, that portion thereof described in the Deed
to Santos Inc., recorded July 19, 1955, Book 7724, Page 374,
Alameda County Records.

ALSO EXCEPTING THEREFROM, that portion thereof described in the
Deed to Santos Inc., recorded July 19, 1955, Book 7724, Page 376,
Alameda County Records.

ALSO EXCEPTING THEREFROM, that portion thereof described in the
Deed to Lillian Ruth Sandman, recorded August 24, 1955, Book
7761, Page 304, Alameda County Records.

PARCEL TWO:

Easement for overlapping improvements, appurtenant to Parcel 1
above, described as follows:

That portion of Block 143, City of Oakland, as shown upon
"Higley's Map of Clinton", filed June 10, 1854, Book "B" of
Deeds, Page 537, Alameda County Records, described as follows:

Beginning at a point on the Northeasterly line of East 23rd
Street, distant thereon Southeasterly 175 feet from the
Southeasterly line of Ninth Avenue and to the Southeastern line
of the land described in the Deed to George B. Cahill, et ux,
recorded August 10, 1945, Book 4735, Page 303, Alameda County
Records; thence Northeasterly along said last named line 73 feet,
6 inches, to the actual point of beginning; thence Northwesterly
and parallel with said line of East 23rd Street 36 feet; thence
Northeasterly parallel with said line of Ninth Avenue 2 feet;
thence Southeasterly and parallel with said line of East 23rd
Street 36 feet; thence Southwesterly and parallel with said line
of Ninth Avenue 2 feet to the point of beginning.

EXHIBIT "A"

PRELIMINARY CHANGE OF OWNERSHIP REPORT

Please answer, to the best of your knowledge, all applicable questions, sign and date. If a question does not apply, indicate with "N/A".

## PART III: PURCHASE PRICE & TERMS OF SALE

A. CASH DOWN PAYMENT OR Value of Trade or Exchange (excluding closing costs)     Amount $ _____

B. FIRST DEED OF TRUST @____% Interest for____years. Pymts./Mo. = $_____(Prin. & Int. only)   Amount $ _____
- ☐ FHA    ☐ Fixed Rate    ☐ New Loan
- ☐ Conventional    ☐ Variable Rate    ☐ Assumed Existing Loan Balance
- ☐ VA    ☐ All Inclusive D.T. ($_____Wrapped)    ☐ Bank or Savings & Loan
- ☐ Cal-Vet    ☐ Loan Carried by Seller    ☐ Finance Company
- Balloon Payment   ☐ Yes   ☐ No    Due Date _____    Amount $ _____

C. SECOND DEED OF TRUST @____% Interest for____years. Pymts./Mo. = $_____(Prin. & Int. only) Amount $ _____
- ☐ Bank or Savings & Loan    ☐ Fixed Rate    ☐ New Loan
- ☐ Loan Carried by Seller    ☐ Variable Rate    ☐ Assumed Existing Loan Balance
- Balloon Payment   ☐ Yes   ☐ No    Due Date _____    Amount $ _____

D. OTHER FINANCING: Is other financing involved not covered in (b) or (c) above? ☐ Yes ☐ No   Amount $ _____
- Type _____ @____% Interest for____years. Pymts./Mo. = $_____ (Prin. & Int. only)
- ☐ Bank or Savings & Loan    ☐ Fixed Rate    ☐ New Loan
- ☐ Loan Carried by Seller    ☐ Variable Rate    ☐ Assumed Existing Loan Balance
- Balloon Payment   ☐ Yes   ☐ No    Due Date _____    Amount $ _____

E. IMPROVEMENT BOND ☐ Yes ☐ No    Outstanding Balance: Amount $ _____

F. TOTAL PURCHASE PRICE (or acquisition price, if traded or exchanged, include real estate commission if paid.)    Total Items A through E   $   N/A

G. PROPERTY PURCHASED: ☐ Through a broker; ☐ Direct from seller; ☐ Other (explain)_____
If purchased through a broker, provide broker's name and phone no.: _____
Please explain any special terms or financing and any other information that would help the Assessor understand the purchase price and terms of sale.
_____
_____
_____

## PART IV: PROPERTY INFORMATION

A. IS PERSONAL PROPERTY INCLUDED IN THE PURCHASE PRICE? (Other than a mobilehome subject to local property tax)? ☐ Yes ☐ No   If yes, enter the value of the personal property included in the purchase price $_____   (Attach itemized list of personal property)

B. IS THIS PROPERTY INTENDED AS YOUR PRINCIPAL RESIDENCE: ☐ Yes ☐ No
If yes, enter date of occupancy _____ / _____ , 19_____   or intended occupancy _____ / _____ , 19_____ .
                               MONTH   DAY                      MONTH   DAY

C. TYPE OF PROPERTY TRANSFERRED:
- ☐ Single-family residence    ☐ Agricultural    ☐ Timeshare
- ☐ Multiple-family residence (no. of units:_____)    ☐ Co-op/Own-your-own    ☐ Mobilehome
- ☐ Commercial/Industrial    ☐ Condominium    ☐ Unimproved lot
- ☐ Other (Description: _____ )

D. DOES THE PROPERTY PRODUCE INCOME? ☐ Yes ☐ No

E. IF THE ANSWER TO QUESTION D IS YES, IS THE INCOME FROM:
- ☐ Lease/Rent    ☐ Contract    ☐ Mineral rights    ☐ Other-explain: _____

F. WHAT WAS THE CONDITION OF THE PROPERTY AT THE TIME OF SALE?
- ☐ Good    ☐ Average    ☐ Fair    ☐ Poor
Enter here, or on an attached sheet, any other information that would assist the Assessor in determining the value of the property such as the physical condition of the property, restrictions, etc. _____
_____

*I certify that the foregoing is true, correct and complete to the best of my knowledge and belief.*

X _Lonnie Ratliff_                LONNIE RATLIFF, SR.
Signature of New Owner/Corporate Officer          Please Print Name of New Owner/Corporate Officer

Date: _1/21/99_    Telephone number where you are available from 8:00 a.m. - 5:00 p.m. ( 925 ) 254-3450
**(Note: The Assessor may contact you for additional information.)**

If a document evidencing a change in ownership is presented to the recorder for recordation without the concurrent filing of a preliminary change of ownership report, the recorder will charge an additional recording fee of twenty dollars ($20).



Do , Record _____

# COUNTY OF
## PRELIMINARY CHANGE OF OWNERSHIP REPORT
(To be completed by transferee (buyer) prior to transfer of subject property
in accordance with Section 480.3 of the Revenue and Taxation Code)

### This report is not a public document

| ASSESSOR'S USE ONLY SALE SOURCE CODE |
| --- |

N.S.P.: _____
C.E.: _____
APR.: _____
DATE: _____

| USE | NBHD |
| --- | --- |
|  |  |

Seller/Transferor: LONNIE RATLIFF SR., a widower

Buyer/Transferee: LONNIE RATLIFF SR., as Trustee of the LONNIE RATLIFF, SR. 1999 TRUST a revocable living trust dated:

Assessor's Parcel Number(s): _____

Property Location/Address of Property Transferred: 2304 9th Ave., Oakland

Mail Tax Information To: Name: Lonnie Ratliff, Sr.

Address: 2304 9th Ave., Oakland, CA 94606

NOTICE: A lien for property taxes applies to your property on March 1 of each year for the taxes owing in the following fiscal year, July 1 through June 30. One-half of these taxes is due November 1, and one-half is due February 1. The first installment becomes delinquent on December 10, and the second installment becomes delinquent on April 10. One tax bill is mailed before November 1 to the owner of record. If this transfer occurs after March 1 and on or before December 31, you may be responsible for the second installment of taxes due February 1.

The property which you acquired may be subject to a supplemental tax assessment in an amount to be determined by the          County Assessor. For further information on your supplemental roll tax obligation, please call the Appraisal Division

---

## PART I:   TRANSFER INFORMATION          Please answer all questions.

YES  NO

☐ ☒ A. Is this transfer solely between husband and wife? (Addition of a spouse, death of a spouse, divorce settlement, etc.)

☐ ☒ B. Is this transaction only a correction of the name(s) of the person(s) holding title to the property? (For example, a name change upon marriage)

☐ ☒ C. Is this document recorded to create, terminate, or reconvey a lender's interest in the property?

☐ ☒ D. Is this transaction recorded only to create, terminate, or reconvey a security interest (e.g., cosigner)?

☐ ☒ E. Is this document recorded to substitute a trustee under a deed of trust, mortgage, or other similar document?

☐ ☒ F. Did this transfer result in the creation of a joint tenancy in which the seller (transferor) remains as one of the joint tenants?

☐ ☒ G. Does this transfer return property to the person who created the joint tenancy (original transferor)?

H. Is the transfer of property:

☒ ☒    1. to a trust for the benefit of the grantor, or grantor's spouse?

☒ ☐    2. to a trust revocable by the transferor?

☐ ☒    3. to a trust from which the property reverts to the grantor within 12 years?

☐ ☒ I. If this property is subject to a lease, is the remaining lease term 35 years or more including written options?

☐ ☒ J.* Is this a transfer from parents to children or from children to parents?

☐ ☒ K.* Is this transaction to replace a principal residence by a person 55 years of age or older?

☐ ☒ L.* Is this transaction to replace a principal residence for a severely disabled person?

*If you checked yes to J, K or L, an applicable claim form must be filed with the County Assessor.

Please provide any other information that would help the Assessor to understand the nature of the transfer.

Transfer

---

## PART II:   OTHER TRANSFER INFORMATION

A. Date of transfer if other than recording date _____          ☐ Merger, stock or partnership acquisition

B. Type of transfer. Please check appropriate box.

☐ Purchase   ☐ Foreclosure   ☐ Gift   ☐ Tax Sale   ☐ Trade or Exchange

☐ Contract of sale — Date of Contract _____

☐ Inheritance — Date of Death _____   ☐ Other: Please explain: _____

☐ Creation of a Lease _ ☐ Assignment of a Lease   ☐ Termination of a Lease   ☐ Date lease began _____

Original term in years (including written options) _____

Remaining term in years (including written options) _____

C. Was only a partial interest in the property transferred?   ☐ Yes   ☐ No   If yes, ☐ Land Only   ☐ Buildings Only

☐ Percentage transferred _____%.

D. IF YOU HAD AN AGREEMENT TO PURCHASE OR AN OPTION TO BUY the property before the date of transfer, please indicate the date of agreement _____

**Please complete applicable information on reverse side.**          SBE ASD AH 502A 111-1009-028 (REV. 2/91)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 **EXHIBIT B** – Deed of Trust
25
26
27
28



2003634688   10/24/2003 08:30 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:        90.00

28   PGS

## RECORDING REQUESTED BY
## FIRST AMERICAN TITLE

Recording Requested By:
THE MORTGAGE STORE FINANCIAL, INC., A CALIFORNIA
CORPORATION

Return To:
THE MORTGAGE STORE FINANCIAL, INC., A CALIFORNIA
CORPORATION
727 WEST 7TH STREET, SUITE #850
LOS ANGELES, CA 90017

Prepared By:

1163345/1966812 ————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

LOAN NO.:  0310091132                          MIN  100141500000003456
ESCROW NO.:  1163345                           MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated            OCTOBER 15, 2003
together with all Riders to this document.
(B) "Borrower" is
LONNIE RATLIFF, JR., A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

Borrower's address is 2304 9TH STREET, OAKLAND, CALIFORNIA 94606
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
THE MORTGAGE STORE FINANCIAL, INC., A CALIFORNIA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  CALIFORNIA

Initials:

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01
VMP-6A(CA) (0207)                 Page 1 of 16        LENDER SUPPORT SYSTEMS, INC MERS6ACA.NEW (08/03)

Lender's address is
727 WEST 7TH STREET, SUITE #850, LOS ANGELES, CA  90017
(D) "Trustee" is
FIRST AMERICAN TITLE INSURANCE CO.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated    OCTOBER 15, 2003
The Note states that Borrower owes Lender

SIX HUNDRED THIRTY THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X X X X X    Dollars
(U.S. $ 630,000.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    NOVEMBER 01, 2033
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [XX] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: [signature]

VMP-6A(CA) (0207)                     Page 2 of 16                     Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
              **COUNTY**                 of                    **ALAMEDA**         :
           [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 022-0318-008                   which currently has the address of
                  **2304 9TH STREET**                         [Street]
           **OAKLAND**               [City] , California       94606     [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: _____

VMP-6A(CA) (0207)                Page 3 of 15                  Form 3005 1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials: _____

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: _____

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _____

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials:

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials: ___

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA